## FRANK F. PELS CO. v. SAXONY SPINNING CO.

(Circuit Court of Appeals, Fourth Circuit. February 6, 1923.)

No. 2058.

1. Sales ⬅️151—Letter of seller held not absolute refusal to perform.

Where there had been numerous complaints between the parties with reference to the quality of the goods delivered under contracts for sale and with reference to the buyer's delay in making payment, a letter writ-ten by the seller to the buyer, expressing surprise at the buyer's request for further shipments, refusing to permit the buyer to buy for the sell-er's account, and stating that when the buyer satisfied the seller beyond doubt it would take the goods and make satisfactory arrangements there-for, the seller would talk further about making further shipments, was not an absolute and unqualified refusal to make further shipments under the contract, and could not be treated by the buyer as an anticipatory breach thereof.

2. Contracts ⬅️313(1)—Absolute renunciation is essential to constitute antici-patory breach.

Before one party can sue another for an anticipatory breach of an executory contract, the renunciation or breach must be an absolute re-fusal on the part of the defendant to perform it.

In Error to the District Court of the United States for the Western District of North Carolina, at Charlotte; James E. Boyd, Judge.

Action at law by the Frank F. Pels Company against the Saxony Spinning Company. Judgment for defendant, and plaintiff brings er-ror. Affirmed.

⬅️For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

John A. McRae, of Charlotte, N. C., and Jerome A. Strauss, of New York City (Plummer Stewart, of Charlotte, N. C., on the brief), for plaintiff in error.

John M. Robinson and E. T. Cansler, both of Charlotte, N. C. (C. R. Hoey, of Shelby, N. C., on the brief), for defendant in error.

Before WOODS and WADDILL, Circuit Judges, and WEBB, District Judge.

WEBB, District Judge. The plaintiff in this action sued the defendant on five different contracts, alleging damages by reason of the ·defendant's renunciation or breach of these contracts on the 22d of October, 1917. The various contracts were executed on December 13, 1915, on September 11, 1916, on October 16, 1916, on January 7, 1916, and on March 13, 1916, respectively. These various contracts required the defendant to deliver to the plaintiff certain quantities of cotton yarns of the numbers 40/2, 50/2, 60/2, and 80/2, at certain stipulated prices per pound. The yarns under the various contracts were to be shipped, in some cases "as soon as possible," and in others at the rate of 1,000 pounds weekly. Payment for the yarns so delivered was to be made on the 1st and 15th of each month.

These contracts were carried out by both parties, with some minor agreed changes, and with some complaint by each party that the other was not doing its duty under the contract, until March 5, 1917, when the plaintiff wrote the defendant, notifying it that the plaintiff did not want any further shipments made on 60/2's against their contract, and stating that the plaintiff would like to have 60/2 cone changed to 40/2 with appropriate change in price. Receiving no reply to this request, the plaintiff, on March 19, wired the defendant not to ship any more yarn "at this time," and followed it up by letter, explaining the telegram and saying:

"We have such an enormous stock of yarn on hand that we are unable to receive any more at the present time, and hope you will grant us this request."

On March 20 the plaintiff wrote defendant that it had received invoice dated the 16th for 60/2's, and added:

"On March 13 we advised you that we did not want any more 60/2's on cones, and hope that you will carry out our instructions in the future, as this confuses us greatly."

On March 21, 1917, the plaintiff wrote defendant, saying:

"In reference to our telegram advising you to discontinue shipments on 40/2's, 60/2's, 80/2's, our reason for doing this, we are figuring on a change in our products. Would like to have you prepare yourself for some definite instructions between now and the 1st of the month, at which time we will advise you exactly what we want done with reference to shipping the yarn to us."

On March 28 the plaintiff wrote the defendant, asking that it kindly continue shipping at the same ratio of quantities as it was doing "at the time we asked you to stop, with the exception that we do not want any yarn on cones." Again, on August 14, the plaintiff wrote the defendant, saying:

"We find that you inclose bill of 60/2's in this morning's mail, and in accordance with our agreement we cannot accept same. We are therefore returning the invoice on 60/2's, and as soon as this arrives we will return same to you."

Some time in September, 1917, the plaintiff began to complain of the quality of yarns that the defendant was shipping, while the defendant insisted by letter and telegram that the quality of the yarn was the same as had always been delivered under the contract. The plaintiff's various orders, discontinuing shipments of yarn and demanding change of certain numbers, were contrary to the contract agreements. However, these requests seem to have been granted as far as possible by the defendant, and deliveries were continued agreeably to the plaintiff's requests until September, 1917. However, the defendant complained from time to time about the conduct of the plaintiff in failing to pay for the yarn promptly; one complaint being in the following language, dated March 22, 1916:

"You seem to be overlooking your promise to send us check on the 15th as per your promise and contract. We have arranged to make you good shipments on your order, and just about the time we get our machinery on your yarn you fall down on your payments. What is the matter?"

To this letter the plaintiff replied on March 24:

"We would state there has been a slight misunderstanding in our office of your terms; otherwise, your check would have gone forward on the 15th."

It appears from the plaintiff's own evidence that it was due the defendant $1,393 on March 15, 1916, and that the check was not forwarded until March 24. As early as April 6, 1916, the defendant telegraphed plaintiff as follows:

"Letter and telegram received. So long as payments are irregular, we cannot afford to make shipments."

To this telegram the plaintiff replied that, while its checks were slightly late, owing to error on the part of the bookkeeper, it still demanded that the defendant live up to its contract, and that, if it did not do so, plaintiff would bring a lawsuit against the defendant. Shipments, it seems, went forward according to agreement, although in March the plaintiff did not pay for the yarn on the 1st and 15th of the month, as per contract. On March 17, the plaintiff, owing defendant $357, delayed sending check until the 24th; and on July 1, 1916, the plaintiff owed defendant $1,265, but did not send check until July 5.

On October 23 1916, the defendant telegraphed the plaintiff:

"Remittance due the fifteenth not received. What is the matter?"

The plaintiff admitted, on the trial below, these failures to remit, and also admitted that on October 15, 1916, plaintiff owed the defendant $2,238, but did not send check until the 23d. Having received this telegram from defendant, "Good shipment 40/2's to go out when you remember fifteenth," the plaintiff on November 18, 1916, wrote:

"As per your wire of to-day, we herewith inclose you check. This was caused by the negligence of our bookkeeper, and we ask your pardon, and will see that in the future your bills are paid promptly."

On December 15, 1916, the plaintiff owed defendant $5,660, and did not pay until the 19th. Again, on January 6, 1917, the defendant telegraphed plaintiff:

"Remittance of the first not received. What is the matter?"

On January 15 the plaintiff owed defendant $2,426, and paid same on the 17th. Again, on February 8, the defendant telegraphed the plaintiff:

"We note your remittance, which should have been mailed on February first, has not yet arrived. Please let that come forward by first mail, but do not fail to send check on the fifteenth, as we have some heavy cotton drafts to meet and must have it."

Again, on February 1, 1917, the plaintiff owed defendant $3,863, and did not send check until the 14th. On February 21 the defendant wrote the plaintiff:

"With reference to remittances, the agreement was you would remit on the 1st and 15th of each month. Your remittance, which was due on February 1, reached us on the 15th, about 12 days late. The one which should have been mailed on the 15th has not yet arrived. Please let check come forward at once, and see to it in the future that checks are mailed on time."

Which letter was occasioned by the fact that the $4,511 due on the 15th was not sent until the 21st. Again, on March 1, plaintiff owed the defendant $3,507, but did not pay until the 12th. On that day defendant wired plaintiff:

"Check due March first not received. What is the matter?"

The plaintiff admits that this check was not mailed until the twelfth day after it was due, and until receipt of the telegram from defendant. On March 15 plaintiff owed the defendant $4,315. On March 19 defendant telegraphed:

"Check due fifteenth not received. What is the matter?"

In reply to which the plaintiff wrote on the 21st:

"Inclosed you will find check for your account, which we ask you to kindly place to our credit. We ask your pardon for the delay in sending this check, and we will try in the future to meet your bills as per our agreement."

Notwithstanding this renewed promise, the plaintiff on April 1 owed $3,615, which it did not pay until the 4th, on which date it had received the following telegram from defendant:

"Check due first not received."

On May 15, 1917, the plaintiff owed the defendant $1,858. On the 18th the defendant wired:

"Check due fifteenth not received. Will be compelled to suspend shipments if you cannot remit as per terms contract. Wire answer quick."

Plaintiff immediately replied, "Check mailed yesterday." On July 1 plaintiff owed $6,616 and did not pay until the 5th. On July 21 defendant telegraphed:

"Mail in and no check. If you have sent it, it is lost. Send duplicate."

Replying to a letter of the plaintiff dated June 18, 1917, the defendant, among other things, said:

"Our records show no such request, except at the beginning of March, you had given us specifications or shipping instructions, and we were making every week shipments on these orders in the manner in which they were placed, and you wrote us canceling all orders for 50/2. * * * In the same letter in which you canceled these 50/2, you asked us to make shipment of 40/2. This we would not do, as you seem to think that we would lose the difference in price of 50/2 as well as the gassing. Had you allowed us to continue shipment of 50/2 gassed, as we were doing, these orders would have been completed long ago, when we had the cotton that we could make them out of. We certainly were not going to change your order from the 50/2 gassed to 40/2 on any such terms as you requested; certainly not when you cancel outright the orders for 50/2. You ask us to advise just what our proposition will be. Under the circumstances, we do not feel that it is up to us to make any proposition, but, if you have one, we will be glad to entertain it."

On July 7, 1917, the plaintiff wired defendant as follows:

"Do not make any further shipments against our contracts of 60/2. This is not a cancellation, but only holding up delivery. Explanatory letter follows."

On July 24 the defendant telegraphed plaintiff:

"Your telegram covers entirely too much territory. We shall be compelled to continue making 60/2 as ordered, as we cannot agree to your last proposition."

On the 24th the plaintiff telegraphed:

"We are trying our best to agree with you, but at the same time, as stated before, we cannot use your 60's in further quantities."

On July 24 the plaintiff wrote defendant, complaining of the quality of the yarn, and on September 14 the defendant wired saying:

"Telegram received. Yarns running as good as they have all the year. You forced us to deliver all year at a loss to us. Now that the market has turned, and it looks as if you will have a loss, you attempt to kick us out, crying 'quality.' We therefore notify you that you will take every pound required on contract or make a satisfactory adjustment of these contracts not later than Monday, the 17th. Shipments will continue, and payments must not fall behind."

The plaintiff testified that, notwithstanding it sent a telegram to the defendant on September 13 saying, "Your yarn is running so unsatisfactory, discontinue further shipments," yet the plaintiff paid for these yarns at the contract price, and also made a supplemental agreement with defendant on the 24th of September, 1917, reserving the privilege of converting the 40's due the plaintiff into 80's, and requiring the defendant to immediately begin the delivery of the 80's at 1,100 pounds a week of the same yarn that the plaintiff claimed was running so unsatisfactorily.

At the time of sending its telegram ordering discontinuance of further shipments on account of the quality of the defendant's yarn, said telegram being dated the 13th, the plaintiff owed defendant about $3,-000, which was 7 or 8 days past due, and it seems from the testimony that the defendant's president, Edgar Love, went to New York for the purpose of collecting it. It appears that Mr. Love and Albert E. and

Frank Pels, plaintiff's representatives, had an hour's discussion of the matter in the plaintiff's office, and the plaintiff claims that then and there a supplemental agreement was entered into with reference to the delivery of the remainder of the yarns due on the contract.   Prior to this time there had been a serious controversy between the plaintiff and the defendant as to whether contract 1567 had been canceled; and also there was a controversy as to whether Nos. 1578 and 1591 for 50's had been canceled.   At this meeting in New York Mr. Love did not get his check for the amount due, but returned to his home in North Carolina without it, although the plaintiff admits, among other things, that it was for his money that Love went to New York.   He asked the plaintiff's representatives for a check, and they told him that they would give it to him, but did not do so, and only sent it to him at his home in North Carolina with a letter purporting to state the terms of the supplemental contract or agreement.

Prior to this visit of Mr. Love to New York in September, 1917, the plaintiff had been attempting to get the defendant to convert what the plaintiff claimed was the balance of 60/2 due under contract No. 1567 into 40's and 80's, and Mr. Love had refused to do so, and after this refusal the plaintiff expressly instructed the defendant not to ship any more 60's.   After Mr. Love's return to North Carolina from New York, to which city he had gone by reason of the telegram of plaintiff of September 13 notifying him to ship no more yarns, the plaintiff on September 24 wrote defendant, saying:

"As per agreement, we send you inclosed herewith our check for $3,082.63 in payment of the bills of September 7 and 14.   It is mutually agreed that you are to use your best efforts from now on to dispose of whatever 60's we may have on hand at the present time, which we claim does not run up in size and quality.

"Regarding the 40's, it is agreed that no further shipments shall be made us at the present time.   This is in no way a cancellation of our contract on this number.   We will have the privilege of changing the balance due us on our contract on our 40's to 80's, if desired by us, at the basis of $1.20 per pound. The delivery on the 80's shall be about 1,100 pounds per week, larger quantities, if desired by you, to start immediately."

It seems that no immediate answer was made to this letter by the defendant, and on October 1, 1917, the plaintiff wrote defendant stating, "No invoices have been received," and asking "What shipments can we expect weekly on 80's?"   Again, on October 18, the plaintiff wrote the defendant, demanding immediate shipments of 80's according to the New York conversation, and saying that the plaintiff's stock had been reduced, and if defendant failed to make shipment the plaintiff would go into the open market and buy, and charge the defendant the difference.   In answer to that letter the defendant, on October 22, wrote the plaintiff the following letter:

"Replying to your letter of October 18th:

"First:  You will remember that a few weeks ago you wired us and repeated the assertion to us in New York that our yarn was running so badly, we would have to discontinue shipments.

"Second:  You refused to make payments according to contract on the 15th and it was necessary for us to make a trip to New York in order to collect this account.

"Third: The writer told you while in New York it would be entirely satisfactory to us to cancel the entire lot of orders, and that if the yarn was so unsatisfactory we would not ask you to take another pound of it.

"Fourth: The writer also told you of the great inconvenience your stopping of shipments and the consequent necessity of our changing our frames on to other numbers, and it had worked a great inconvenience to us, besides the expense of our going to New York to collect the account.

"Fifth: You recall you told us of the large stock of our yarns that you had on hand, and that you were unable to move them on account of the inferior quality of this yarn.

"Sixth: We are informed that other mills in this community have on hand large stocks of yarns, which you have refused to accept or have held up shipments on.

"In view of all these facts, we are surprised to receive your letter requesting further shipments of yarn from us at this time, and will therefore say positively that you cannot buy any yarn for our account, and when you satisfy us beyond any question of a doubt that you will take in the yarns and make satisfactory arrangements with us for the yarn, we will talk to you further about making further shipments."

At the conclusion of the testimony for the plaintiff, the defendant announced that it would offer no evidence, and moved the court to dismiss the plaintiff's action, or to direct a verdict for the defendant. The court below declined this motion, and submitted to the jury five issues, the first issue being, "Were the various contracts entered into by the plaintiff and defendant?" By consent this issue was answered "Yes." In answering the second issue the jury found that the defendant breached the contracts on October 22, 1917. In answering the third issue, the jury found that the plaintiff was not at all times prior to October 22, 1917, ready, able, and willing to carry out and perform the terms of said contract. In answering issue No. 4, the jury found that the plaintiff and defendant did not agree on or about September 21, 1917, to abandon or cancel said contracts; and in answering issue No. 5, the jury found that the plaintiff had suffered damage by reason of the defendant's breach of said contracts in the sum of $9,617.57. Whereupon the court below awarded judgment for the defendant notwithstanding the verdict of the jury, and from this judgment of the court the plaintiff appealed.

We will not enter into a discussion of all the questions raised as to the action of the court below in rendering judgment for the defendant notwithstanding the verdict of the jury, as this becomes unnecessary, in view of our conclusion that this action was brought prematurely, and is fatal to plaintiff's recovery.

[1] The plaintiff alleges that the defendant breached the contract by its letter of October 22, 1917. In view of all the circumstances and evidence in this case we cannot hold that this letter was an absolute, positive, and unequivocal refusal to comply with the contracts in question. The plaintiff and the defendant had been in almost constant controversy for nearly a year before this letter was written. The plaintiff from time to time had desired the numbers of the yarns changed, and the defendant was constantly complaining that the plaintiff was not paying for the yarns on the due dates, but that in almost every instance there was a delay of from 3 to 10 days. The defendant complained that the plaintiff had canceled outright certain of the contracts, and

that finally the plaintiff claimed that the yarns were not of proper quality, which the defendant immediately denied by telegram, and claimed that the yarn was as good a quality as had been shipped all the year. Indeed, as late as September 14, 1917, the defendant telegraphed the plaintiff that the yarns were running "as good as they have all the year," and notified the plaintiff that it would take every pound due on the contract or make a satisfactory adjustment of these contracts not later than Monday, the 17th.

The controversy had evidently reached such a disagreeable stage between the plaintiff and the defendant—particularly as to the prompt payment for the yarns—that the defendant, through its president, Mr. Edgar Love, went to New York on the 20th of September, 1917, for the purpose of collecting the $3,000 then due. For some reason not fully explained—the president, Mr. Love, having died since the institution of this suit and before the trial below—he did not get the $3,000 on his visit to New York. After Mr. Love's return to North Carolina, the plaintiff wrote the defendant a letter suggesting certain additional agreements as to contracts, and inclosing a check for the amount past due. To this letter the defendant did not reply until the receipt of a letter from plaintiff demanding a shipment on the alleged supplemental agreement, and threatening to go into the open market and buy yarns and charge the difference to the defendant. Thereupon the defendant. through its president, Mr. Love, on October 22, 1917, wrote plaintiff the letter quoted above. After narrating all the troubles the defendant had had with the plaintiff about the yarn contracts, the letter concludes with this paragraph:

"In view of all these facts we are surprised to receive your letter requesting further shipments of yarn from us *at this time*, and will therefore say positively that you cannot buy any yarn for our account; and when you satisfy us beyond any question of a doubt that you will take in the yarns, and make satisfactory arrangements with us for the yarn, we will talk to you further about making further shipments."

This paragraph of this letter cannot, in the light of the decisions, be held as an unequivocal and absolute refusal to carry out the contract. It will be noted that the writer expresses surprise at the request for further shipments "at this time," and forbids the plaintiff to buy any yarn for the defendant's account, and adds a condition which is tantamount to saying to the plaintiff that, when it satisfies the defendant that the plaintiff will take the yarns as shipped and pay for them promptly according to contract, then the defendant will make further shipments.

We cannot but hold, from all the circumstances of the case, remembering the many troubles and worries and difficulties that the defendant had had with the plaintiff on account of delayed payments of amounts due, and charges of inferior yarn, and temporary cancellations of shipments, and requests for changes of numbers, that the defendant was justified in writing this letter, and in adding the clause just quoted. The defendant simply meant to say that, in view of the difficulties of the past year, it was nothing but right that the plaintiff and the defendant should come to a thorough understanding about receiving the yarns without further complaint as to quality, and that the

287 F.—19

payments should be made promptly according to the contract, and that guaranties to this effect should be given to the defendant. In other words, this letter, and the last paragraph, was not an absolute renunciation of the contract, but the whole matter was left open for adjustment and negotiation between the parties.

[2] It has been often held that, before a party can sue for an anticipatory breach of an executory contract, the renunciation or breach must be an absolute refusal on the part of the defendant to perform it. Cutter v. Powell, 2 Smith's Leading Cases, ——, cited with approval in Roehm v. Horst, 178 U. S. 1, 20 Sup. Ct. 780, 44 L. Ed. 953. Mr. Chief Justice Fuller in writing the opinion in Roehm v. Horst, says:

"It was ruled that, as there could be a breach of contract before the time fixed for performance, a positive and absolute refusal to carry out the contract prior to the date of actual default amounted to such a breach."

In the case of Dingley v. Oler, 117 U. S. 490, 6 Sup. Ct. 850, 29 L. Ed. 984, the court passed upon the following language in a letter by defendant to the plaintiff, to wit:

"We cannot, therefore, comply with your request to deliver to you the ice claimed, and respectfully submit that you ought not to ask this of us, in view of the facts stated herein."

This letter was written in reply to a peremptory demand from the plaintiff to deliver the ice immediately under a contract for the same. The court, in construing this language, as to whether or not it was a positive and unequivocal breach, so as to justify the bringing of suit, said:

"This, we think, is very far from being a positive, unconditional, and unequivocal declaration of fixed purpose not to perform the contract in any event or at any time. In view of the consequences sought to be deduced, and claimed as a matter of law to follow, the defendants have a right to claim that their expressions, sought to be converted into a renunciation of the contract, shall not be enlarged by construction beyond their strict meaning."

The court suggested that the implied request by the defendant in this language left the matter open. We think it will be agreed that the language construed in Dingley v. Oler smacks more strongly of renunciation and breach than does the last paragraph of the defendant's letter of October 22. In case of Edwards v. Proctor, 173 N. C. 41, 91 S. E. 584, Judge Walker, writing the opinion of the court, quotes the following with approval:

"In order to justify the adverse party in treating the renunciation as a breach, the refusal to perform must be of the whole contract or of a covenant going to the whole consideration, and must be distinct, unequivocal, and absolute."

In this case many authorities are cited bearing out our view of the law on this question. We therefore hold that this suit was prematurely brought, and that, as the ruling of the court below does substantial justice in rendering a judgment for the defendant, the judgment of the District Court will be affirmed.